IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DAVID FIERST, | : | Case No. 1:15-cv-00649 |
| | : | |
| Plaintiff, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | **ORDER DENYING DEFENDANT'S** |
| | : | **MOTION FOR SUMMARY** |
| OHIO ATTORNEY GENERAL'S OFFICE, | : | **JUDGMENT** |
| | : | |
| Defendant. | : | |
| | : | |

This matter, a civil action brought by an attorney against his former employer, is before

the Court on Defendant's Motion for Summary Judgment. (Doc. 27.) Plaintiff has filed a

memorandum in opposition (Doc. 37), to which Defendant has replied (Doc. 43). For the

reasons that follow, Defendant's Motion will be DENIED.

## I.    BACKGROUND[1]

### A.  Generally

The Office of the Ohio Attorney General ("OAG") has nearly 30 sections that serve Ohio

citizens. Ohioans of all kinds—families, taxpayers, consumers, veterans, crime victims, and

more—are touched by the work of the OAG. Attorneys who work for the OAG, known as

Assistant Attorneys General ("AAGs"), are at-will employees.

In 2007, David Fierst was hired as Managing Attorney in the Cincinnati regional office.

Part of his work included civil commitment hearings for the Health and Human Services

("HHS") section, where he advocated on behalf of the Ohio Department of Developmental

---

[1] Except as otherwise indicated, background facts are drawn from Defendant's Proposed Undisputed Facts (Doc. 27-1 at PageID 1222–37) to the extent those facts are admitted in Plaintiff's response thereto (Doc. 37-1 at PageID 2642–48). Where the parties do not expressly agree, the Court cites to that portion of the record providing support for the statement.

1

Disabilities ("DODD"). Fierst's role as Managing Attorney was short-lived, however. In October of that same year, he was demoted to a staff AAG[2] and reassigned to the Workers' Compensation section in Columbus. Fierst transferred back to Cincinnati in May 2008. In addition to handling workers' compensation matters in Cincinnati, he resumed doing the commitment work for HHS. Fierst was terminated on July 17, 2015. (Madden Decl., Doc. 27-4 at PageID 1303 (¶ 19).)

During the relevant time period, James Barnes served as the Workers' Compensation Section Chief in Columbus. Before Barnes instituted a "team" concept in Cincinnati, Fierst reported to Steve Fixler, who also worked in Cincinnati and was the head of the unit. (Fixler Dep., Doc. 24 at PageID 1034 (6:9–15).) Fixler, in turn, reported to Barnes. (*Id.* at PageID 1131–35 (6:16–7:3).) Approximately two years before his termination, Fierst worked under James Carroll, one of two team leaders in the Cincinnati unit. (Carroll Dep., Doc. 25 at PageID 1097 (9:13–22).) Carroll reported both to Fixler, as unit chief, and Chris Wagner, the Managing Attorney of the Cincinnati regional office. (*Id.* at PageID 1096–97 (8:20–9:2); Wagner Dep., Doc. 36 at PageID 2546 (9:8–17).) Wagner reported to Mary Mertz, who, as First Assistant Attorney General, reported to Attorney General Mike DeWine. (Wagner Dep., Doc. 36 at PageID 2567 (30:15–16); Mertz Dep., Doc. 19 at PageID 401–02 (8:16–9:2).) Attorneys in the Cincinnati unit received assignments, in most instances, from their Section Chief rather than from the Managing Attorney. (Wagner Dep., Doc. 36 at PageID 2549–50 (12:19–13:11).)

The Workers' Compensation section nominally is funded through the Bureau of Workers' Compensation ("BWC") and the Industrial Commission ("Commission"). (Murniecks Decl., Doc. 27-6 at PageID 1341 (¶ 3).) In theory, these two clients are supposed to fund 100%

---

[2] Fierst's pay rate remained the same. As discussed *infra*, throughout his employment Fierst consistently was one of the highest paid attorneys in the Workers' Compensation section.

of the section's operating costs. (*Id.*) Shortfalls occur, though, when the expenses of the section exceed the revenue from the BWC and the Commission. (*Id.* at PageID 1342 (¶ 6).) Such was the case in fiscal year 2014, when the combined expenses were $8,673,449.26 and the revenue received was $8,335,186.33, and in fiscal year 2015, when the combined expenses were $8,670,486.67 and the revenue received was $8,375,322.42. (*Id.*)

## B. Cincinnati Bar Association Speaking Engagement

On October 16, 2013, Barnes learned that Fierst had agreed to participate in a program titled "Workers' Compensation Law Update" that was to be presented by the Cincinnati Bar Association Workers' Compensation Committee the following December 5. (Barnes Decl., Doc. 27-2 at PageID 1239 (¶ 6), 1243–46.) Fierst was listed as an Assistant Attorney General and was to give the "BWC Perspective" on the subject of "Trial Procedures and Tactics." (*Id.* at PageID 1245.) In response, Barnes emailed Fierst, saying "Dave, prior to the seminar, I would like to see [sic] copy of any written material you intend to submit." (*Id.* at PageID 1243.) He also emailed Fixler, asking "Who approved Dave to give [sic] presentation on behalf of the office at this seminar?" (*Id.* at PageID 1244.)

Fierst apologized to Barnes for "not getting permission in advance" to participate, explaining "[h]ad I known of this requirement, I would have been happy to do so and I certainly in no way meant any disrespect to you." (*Id.* at PageID 1247.) He also stated that he would advise the bar association that he would be unable to participate. (*Id.*) Barnes replied:

> I will leave it [sic] you as to whether to cancel with the bar association. It has always been a policy of the office and section to give prior notification when someone is considering a presentation on behalf of the office or section. The reason is to insure that the topic is appropriate and consistent with office/section practice, policy, procedure, etc. Prior notice allows us to review and consider the material to be presented and the target audience. Prior to my own presentations I do the same with the front office. In addition, the brochure states that your presentation will be giving a 'BWC Perspective'. That is also important as the

> potential attendees are lead [sic] to believe you will be speaking on behalf of
> BWC. This seems misleading. Isn't it the perspective of BWC's legal counsel
> (the AG's Office)? What perspective would BWC have on cross-examination and
> trial tactics? If you intend to go forward with the presentation, I would like a
> summary of what you intend to say about cross-examination and trial tactics in
> general.

(*Id.*) Fierst answered, "I will advise the bar association that I am unable to speak at the seminar. I will ask the bar association to call Steve." (*Id.* at 1249.) His email to the bar association read, "I am so sorry to tell you, but I have found out my commitment to speak was not cleared with the senior management of our office in Columbus. That being the case, please contact Steve Fixler from our office for an alternate speaker." (*Id.* at PageID 1251.) Fixler forwarded this email to Barnes, whose reaction was "Amazing! He blames senior management for bailing out of [sic] presentation. My e-mail never said he could not do it, just what was needed before he did it." (*Id.* at PageID 1254.)

The OAG characterizes Fierst's behavior as the beginning of him becoming "uncooperative, argumentative, and insubordinate." (Doc. 27 at PageID 1194.)

## C. Appellate Briefs

To improve the quality of the appellate briefs being filed by section AAGs in the Cincinnati regional office, Barnes created a review committee.[3] Once a draft was completed, the authoring AAG was required to submit it to the panel in file-ready format. Necessary edits would be made, then, before the brief was filed.

Fierst had little experience filing appellate briefs. And apparently one of the first ones he filed[4]—regarding claimant Charles Carr in January 2014—was problematic. The review team

---

[3] In addition to Section Chief Barnes, his Assistant Chief Crystal Richie, and Steve Fixler, the other members of the committee were Mark Mastrangelo and Jeffrey Duber from the Cleveland regional office and Cheryl Nester and Patsy Thomas from Columbus. (Barnes Dep., Doc. 17 at PageID 98–99 (39:10–40:1).)

[4] During his deposition Fierst was asked:

made substantial edits to his brief, which was only three pages in length and contained errors.

(*Id.* at PageID 1239 (¶ 8); Fierst Dep., Doc. 21 at PageID 639 (140:6–9).) Despite the review

team's input, the brief, as filed, still contained "punctuation and typographical errors." (Fierst

Dep., Doc. 21 at PageID 639 (140:2–5).) This string of email exchanges followed. First, Barnes

to Fierst:

> I am at a loss to understand how so many errors/mistakes/typos remained in the brief despite them being brought to your attention on 4 separate occasions by members of the review team. I am especially concerned since the body of this brief is only 3 pages long. There appears to be a lack of proofreading and attention to details, including, but not limited to your citation to a case in the first assignment of error (*Tisdale*) that you do not set forth in the body of the brief. This reflects badly on the quality of work produced by the office and section. What happened? We anxiously await your response.

(Doc. 27-2 at PageID 1256.) Fierst to Barnes:

> Why is it necessary to have four separate edits on a brief? Trying to sort through the multiple and sometimes contradictory instructions from the various committee members is very confusing. It would be much simpler to receive a final edit from you after the committee, with as the clearinghouse, agrees to the changes. Better yet, why not just send it back to the attorney filing the appeal in the final form you desire? This would eliminate a tremendous amount of confusion.

(*Id.*) Frustrated that Fierst had "place[d] the blame" on the review team for his failure to file a

quality brief, Barnes set up a teleconference with all parties involved. (*Id.* at PageID 1255.)

Barnes recalls Fierst stating that, "no one in Cincinnati, including judges, had a problem with his

work product." (*Id.* at PageID 1258.) He knew he was going to win the case, "so he did not

understand why we needed to discuss the matter." (*Id.*) When Barnes asked why he did not

proofread his brief before filing it, Fierst said "he was in a hurry and wanted to file the brief on

---

> Q How many court of appeals briefs had you drafted while you were in the work comp section in Cincinnati prior to the Carr brief, if you recall? I assume you're not going to have an exact number, but if you can ballpark it for me.
>
> A I know the Solomon case. I'm not sure that I had any others. Maybe – I don't know. I don't want to say just one, but it could possibly have been that.

(Fierst Dep., Doc. 21 at PageID 638 (139:15–22).)

time." (*Id.*)  Consistent with Barnes' written summary of the meeting, Fierst recalled that

Barnes' message to him was that he needed to accept responsibility for his failures.  (Fierst Dep.,

Doc. 21 at PageID 626–27(128:22–129:1).)  Fierst further testified, though, that Barnes was

unwilling to accept his explanation that he was confused by the process.  (*Id.* at PageID 627

(128:1–21).)  He conceded that his remark to the committee—"With all of this, why don't you

guys just write the brief the way you want."—may have "sound[ed] more argumentative than

perhaps totally than what I meant."  (*Id.* at PageID 130–31 (130:22–131:1).)

On the heels of the Carr brief came another matter involving claimant Kym Marshall.

According to Barnes, the brief submitted by Fierst to the review committee was "in poor shape"

and the committee "needed to spend an excessive amount of time" revising it.  (Barnes Decl.,

Doc. 27-2 at PageID 1240 (¶ 9).)  Unbeknownst to Barnes, however, Fierst also sent a copy of

his brief to the Appeals section.[5]  (*Id.*)  Barnes forwarded to Fierst the edits suggested by the

review committee.  (Doc. 22-1 at PageID 902–03.)  Fierst responded with both comments and

questions.  (*Id.* at 901–02.)  Barnes replied:

> Thank you for your consistency and capitalization questions/comments.  Please
> see responses (in **red**) in your below email.  Moving forward, there is no need for
> you to spend a great deal of time pointing out perceived errors made by the
> review team regarding our non-substantive edits to your brief (i.e., use of upper
> case versus lower case, or where one non-substantive edit on one page may
> conflict with the same non-substantive edit on another page).  We expect you to
> conduct a meaningful review of the edits and use good judgment.  As we
> discussed in our previous lengthy meeting, our expectation was that your brief
> submitted to the review team was not a draft or for us to rewrite.  It should have
> been submitted in form [sic] that was ready to be filed in court.  As the many edits
> suggest, the brief was not submitted to us in a "'ready to be filed form"
> (incomplete quotes, lack of case cite to quote, incorrect structure, flow, improper
> citation form, etc.).  This is especially concerning for such a short brief with a
> limited issue and argument.  We want every document from our section that it

---

[5] The Appeals section of the OAG represents clients in the Supreme Court, the Sixth Circuit Court of Appeals, and the Supreme Court of Ohio.  (Madden Decl., Doc. 27-4 at PageID 1300 (¶ 5).)  Additionally, it provides support for some of the more difficult cases that the OAG handles, such as election issues.  (*Id.*)

filed in court to reflect the level of high quality work the AG demands from us and that the courts expect from our office.

(*Id.* at PageID 901.)  Fierst then forwarded Barnes' reply to Jonathan Fulkerson, Barnes' supervisor,[6] with the comment, "This is incoherent[.]"  (*Id.*; Fierst Dep., Doc. 22 at PageID 797–98 (252:24-253:1).)  Less than fifteen minutes later, Fierst emailed Fulkerson again:

I had the appeals section look at the brief a few days ago. [] One of the comments was "overall the organization of the brief is quite good".  I am so frustrated that Mr. Barnes cant [sic] admit his "review team" makes mistakes.  My secretary and I are being driven crazy by this.

(Doc. 22-1 at PageID 900.)  Fulkerson instructed Fierst to contact Barnes.  (*Id.*)  He later emailed Barnes, asking if it was "normal" for his AAGs to send their briefs to the Appeals section for review and noted that he was "bothered by David sending things outside the proper chain of command."  (*Id.*)  Barnes, too, was "frustrated and disappointed" that Fierst did not go through the appropriate channels.  (Barnes Decl., Doc. 27-2 at PageID 1240 (¶ 9).)

## D.  DODD's Request for Representation

As recited earlier, when Fierst transferred back to Cincinnati in May 2008 he handled not only workers' compensation matters, but also the commitment work for the HHS section. Regarding the latter, his role was to represent the DODD's interests when an individual might need to be committed involuntarily to an institution for care related to an intellectual disability. (Marziale Decl., Doc. 27-5 at PageID 1339 (¶ 3).)

On April 13, 2015, the Program Director from the Southwest Ohio Developmental Center corresponded with Fierst.  (Doc. 37-2 at PageID 2658.)  She advised him of a hearing date set by the Clermont County Probate Court, at which the continued commitment status regarding one of her clients would be determined.  (*Id.*)  Fierst responded that because the individual had been

---

[6] Fulkerson is Attorney General DeWine's Deputy Chief Counsel.  (Fulkerson Decl., Doc. 27-3 at PageID 1294 ¶ 2).)

found to be mildly mentally retarded, "I will not be participating in his hearing since the court lacks jurisdiction to have him involuntary committed." (*Id.* at PageID 2656–57.) In response, Vicki Jenkins of the DODD emailed Roger Carroll, the Principal AAG for the HHS section, conveying her view that she did not believe the civil commitment statutes "gives [sic] David the option of not appearing." (*Id.* at PageID 2656.) Carroll in turn contacted Arthur Marziale, HHS Section Chief, relaying his agreement with Jenkins that Fierst's response was "inappropriate." (*Id.*) On May 7, 2015, Marziale sent the following email to Fulkerson and Wagner:

> Roger and I finally had time to discuss. I agree that David cannot simply opt out of representing the client. The department has to have representation. It is up to the court to decide what happens to the individual. David cannot make that determination himself. That being said, can I have any confidence that he will do his job properly? We have had these issues with his representation of DODD before.

(*Id.*) Ultimately the hearing was continued at the State's request. Fierst was not assigned any additional HHS work, because Marziale "felt he ignored his client and ethical obligations." (Marziale Decl., Doc. 27-5 at PageID 1340 (¶ 8).)

For his part, Fierst testified that he specifically copied Carroll on his email to the Program Director "to ensure he was aware of my position and intentions and had an opportunity to question it if he disagreed." (Fierst Decl., Doc. 37-2 at PageID 2652 (¶ 20).) He maintains that at no time did Carroll, his supervisor when he did work for HHS or DODD, ever tell him, or suggest to him, that not attending a hearing was "an unacceptable option." (*Id.*) Fierst insists that he did not believe that the probate court had authority to commit the individual or that his attendance at the hearing was necessary to protect the DODD's interests. (*Id.*)

## E. Performance Reviews

Fixler and Carroll prepared annual performance evaluations of Fierst.

In the last evaluation he prepared, and for the period June 2010 through May 2011, Fixler rated Fierst "4" out of "5" in the areas of "Analytical Ability and Problem Solving," "Verbal Communication," "Written Communication," "Judgment," "Client Assessment and Responsiveness," "Professional Development," and "Professionalism," and a "5" out of "5" in "Organizational Skills," "Independence," and "Dependability and Availability."[7] (Doc. 24-1 at PageID 1083–85.) Fixler awarded Fierst an overall rating of "4" and noted in the "Comments" section:

> Dave does good legal work. His oral and written advocacy skills have improved. He is always willing to help with court appearances, depositions or trial. He has good interaction with the client.

(*Id.* at PageID 1084.) As to Fierst's strengths, Fixler testified:

> Dave was a hard worker. He's a good worker. He produced a good quantity of work. He had an understanding of worker's compensation. It might not have been the same understanding that one would have if they had been doing it 20 years. He had not had that type of experience. But there was no issue with him not being able to work on cases on his own. He was completely independent as far as that's concerned.

(Fixler Dep., Doc. 24 at PageID 1041(13:15–23).) Regarding weaknesses, there were "concerning" issues vis-à-vis Fierst's failure to get along with support staff (two secretaries and a paralegal) and "[m]aybe not having the best communication with them." (*Id.* at PageID 1041–42 (13:24–14:8).)

In the first evaluation he prepared and for the rating period July 2012 through June 2013, Carroll rated Fierst the third highest ("Meets") of the four possible substantive ratings in the areas of "Judgment and Problem Solving," "Organizational Skills," and "Professionalism," and the highest possible rating ("Exceeds") as to "Verbal Communication" and "Written

---

[7] The rating scale used ranged from "1"—the lowest—to "5"—the highest. A rating of "4" means the attorney's performance is characterized "by initiative and high quality and consistently exceeds the requirements and expectations of the evaluator." (Doc. 24-1 at PageID 1083.) A "5" indicates work that is "consistently" characterized "by exceptionally high quality and excellence." (*Id.*)

Communication."[8]  (Doc. 24-1 at PageID 1068–70.)  Carroll commented that "Dave handles a

large case load[,]" and noted that Fierst met his goals of "Less IME's"—which the Court

presumes means "independent medical examinations"—and "Paralegal Utilization."  (*Id.* at

PageID 1070, 1071.)  As to the former, Carroll explained, "By settling cases at an earlier stage

Dave has saved the BWC money and has more time to concentrate onthe [sic] cases that must be

tried[,]" and, regarding the latter, "Dave has a better working relationship with his paralegal who

now does scheduling For his IME's, Depositions, & settlement conferences."  (*Id.* at PageID

1071.)  Carroll awarded Fierst an overall rating of "Meets" and noted:

> Dave is a hard worker and wants to be the best at everything he attempts.  He has
> carried a large case load.[]He has been willing to fill in for other staff when they
> needed to take leave.  He has begun utilizing his support staff more and he will
> continue to increase this utilization to make himself more successful.

(*Id.* at PageID 1073.)  As reviewer of the evaluation, Barnes observed:

> Dave is diligent in handling his cases.  He does very well in dispositive motion
> practice.  He is adept at identifying relevant issues and presenting effective
> arguments to the court in support of our clients[.]

(*Id.*)  Fierst "signed" his evaluation on July 23, 2013, and remarked:

> There is no criteria established from one rating period to the next to establish what
> constitutes "exceeds" expectations.  The evaluations are given and then forgotten
> until the next rating period.  Since I expect a lot out of myself, I would like to
> know what is needed to achieve the highest possible ratings.

(*Id.* at PageID 1073, 1074.)

Carroll prepared a second evaluation for the rating period July 2013 through June 2014.

(*Id.* at PageID 1075–80.)  He again was awarded the third highest rating ("Meets") in "Judgment

and Problem Solving" and "Organizational Skills."  (*Id.* at PageID 1076.)  His "Professionalism"

rating dropped to "Partially Meets," however, and his score for "Written Communication fell

---

[8] Carroll used a form different from the one Fixler completed.  (Doc. 24-1at PageID 1068–74.)  The four substantive ratings are titled, "Exceeds," "Meets," "Partially Meets," and "Does Not Meet."  (*Id.*)

from "Exceeds" to "Meets."  (*Id.* at PageID 1076, 1077.)  His rating for "Verbal

Communication" remained at "Exceeds."  (*Id.* at PageID 1077.)  Carroll's comments were

mixed:

> Dave's case load has been larger than most of the other attorneys in the Cincinnati office this past rating period.  Dave is a hard worker.  Dave strives to do what he feels is the best way to protect our clients' interest.  Dave always pursues his advocacy in an ethical way.  Professionalism, however, is more than just ethics. Dave has on a number of occasions refused to talk to many of his co-workers including myself.  He has erroneously accused his supervisors of not covering his assignments or filing his documents.  He's erroneously accused secretaries of not typing his work when his secretary was absent.  On more than one occasion his demeanor has been loud, confrontational and angry.  His behavior creates a rather tense atmosphere that makes those who have to be around him uncomfortable.  It would have been helpful to me if Dave's side of these issues with other staff were communicated to me.  Dave refused to do the Office's highly suggested, and Section's required, self-evaluation.

(*Id.* at PageID 1077.)  Notwithstanding these criticisms, Carroll nonetheless gave Fierst an

overall rating of "Meets" with this final comment:

> Dave is a hard working, talented attorney who unfortunately experiences difficulty in getting along with his co-workers, both supervisors and support staff. If Dave could improve in this area he will someday be a superior asset to the Office.  If he does not[,] his work and others' work will suffer.

(*Id.* at PageID 1080.)  As reviewer of the evaluation, Barnes added these remarks:

> Dave had case successes this evaluation period (e.g., Tolivar, Stallworth).  At the same time, however, he has been increasingly resistant to directives and instruction from section management.  In one case (Carr), Dave filed an error-filled 3-page brief in court even though the section chief had provided corrective edits before the brief was due to be filed.  In a later case (Marshall), David submitted a brief laden with errors to the review team. (e.g., Incomplete quotes, incorrect structure, improper citation form, flow, etc.).  Rather than accept constructive input, Dave engaged in unproductive back and forth with the team on non-substantive matters.  After much input from the review team, Dave did file an appropriate brief in court.  Fortunately, in both Carr and Marshall, our client received a favorable decision.  Finally, despite my directive for all section staff to submit a self-evaluation of their work performance to their rater, Dave refused to submit a self-evaluation.

(*Id.*)  Fierst "signed" his evaluation on July 16, 2014, and included this response:

> In the past 12 months covering this rating period, I have not been advised of a single instance where anyone outside this office has complained about my work output or my professionalism including opposing counsel. My co-workers, mentioned above, seem to have the idea that my purpose in life is to do the work that they're not interested in doing. When I inquired about why my caseload is almost always the highest in the section for the Cincinnati office, I received vague and unusual answers. Even though I've been assigned work in another section in addition to my high caseload in workers comp, management has refused to provide me with appropriate assistance and back up. Based on the comments about me as outlined above, it is easy to understand why people are leaving this section in droves.

(*Id.* at PageID 1082.)

### F. Fierst's EEOC Charge and Internal Discrimination Complaint

The next day, July 17, 2014, Fierst filed a Charge of Discrimination based on race/color and military status, although he recorded his sex, religion, and age on the form as well. (Doc. 27-4 at PageID 1302 (¶ 16), 1329.) Kathleen Madden, Human Resources Director, submitted a position statement to the Commission on behalf of the OAG. (*Id.* at PageID 1302 (¶ 16).) The EEOC issued a right-to-sue letter, which was mailed on July 7, 2015 and stamped "RECEIVED" by Human Resources on July 9. (*Id.* at PageID 1306 (¶ 18), 1325–30.)

Fierst also filed an internal discrimination complaint on July 24, 2014. (*Id.* at PageID 1337.) EEO Compliance Officer Kristine Cadek conducted an in-house investigation that included interviewing 20 to 30 individuals—Barnes, Fixler, and Carroll among them. (Cadek Dep., Doc. 35 at PageID 2469–71(26:13–28:5).) In a letter dated September 18, 2014, she advised Fierst that her "fact finding review shows that it is NOT PROBABLE any EEO policy violation has occurred." (Doc. 37-2 at PageID 2660.) Fierst invoked the internal appeal process. (*Id.* at PageID 2661.) Amy Golian, Assistant Chief of the Education section, was named the Independent Investigator by Madden. (*Id.*) Golian reviewed the file created by Cadek, and conducted an interview with Fierst. (Doc. 27-4 at PageID 1337–38.) During the two-plus hour

meeting, Fierst provided certain documents for her review.  (*Id.*)  Several weeks later, Golian

sent Fierst a summary of the information he shared with her during the meeting and asked him to

review it for accuracy.  (*Id.*)  Through counsel, Fierst stated he would provide his own summary,

which he came March 6, 2015.  (*Id.*)  On March 18, 2015, Golian informed Madden in writing

that she concurred with Cadek's conclusions.  (*Id.* at PageID 1302 (¶ 17), 1337–38.)

### G.  Termination

Madden travelled from Columbus to Cincinnati to terminate Fierst.  (*Id.* at PageID 1303

(¶ 19).)  She testified that she initially was planning to terminate him during the week of July 6,

2015 until she learned that Fierst would be absent then for medical reasons.  (*Id.*)[9]  She met

instead with Fierst on Friday, July 17, 2015, accompanied by Facility Security Manager Arthur

Reitz.  (*Id.*)  She informed Fierst that his unclassified appointment was being revoked and gave

him the option of resigning or being terminated.  (*Id.*)  Madden testified that Fierst asked to leave

the office to meet with his attorney.  (*Id.*)  Madden denied that request, but offered to let him call

his attorney.  (*Id.*)  When Fierst insisted on leaving, Madden testified that she pushed him to

make a decision.  (*Id.*)  Because Fierst was unable to decide, he was terminated.  (*Id.*)

### H.  Procedural Posture

Fierst filed a three-count Complaint alleging retaliation, race discrimination, and sex

discrimination, all in violation of Title VII.  (Doc. 1.)  In due course, the OAG moved for

summary judgment with respect to all claims.  (Doc. 27.)  In response, Fierst abandoned both his

---

[9] Madden claims that she learned of Fierst's medical absence from both Wagner and Barnes.  Barnes's testimony corroborates hers:

> I learned that the OAG intended to terminate Mr. Fierst's employment during a telephone call from Kathleen Madden.  On that call, I informed her that Mr. Fierst was going to be out of the office for medical reasons July 7–13, 2015.

(Barnes Decl., Doc. 27-2 at PageID 1242 (¶ 14).)  Wagner's does not.  (Wagner Dep., Doc. 36 at PageID 2574–78 (37:19–41:10) ("It was a completely – a complete surprise to me for that day.").)

discrimination claims. (Doc. 37 at PageID 2628.) Remaining for disposition, then, is his retaliation claim.

## II.     STANDARD OF LAW

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The process of evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well-settled. First, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see LaPointe v. United Autoworkers Loc. 600*, 8 F.3d 376, 378 (6th Cir. 1993). This burden may be satisfied, however, by the movant "pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the opposing party must submit evidence in support of any material element of the claim or defense at issue in the motion on which it would bear the burden of proof at trial. *Celotex*, 477 U.S. at 331–32. As "the requirement [of the Rule] is that there be no *genuine* issue of *material* fact," the Supreme Court has made clear that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). Ancillary factual disputes, those "that are irrelevant or unnecessary[,]will not be counted." *Id.* Furthermore, "[t]he mere existence of a scintilla of evidence in support of

the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252. Instead, the opposing party must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339–40 (6th Cir. 1993) (applying *Anderson*, 477 U.S. at 249–50; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

At this summary judgment stage, it is not the Court's role "to weigh the evidence and determine the truth of the matter but [rather] to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In so doing, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970)). Adherence to this standard, however, does not permit the Court to assess the credibility of witnesses. *See Adams v. Metiva*, 31 F.3d 375, 378 (6th Cir. 1994) (citing *Anderson*, 477 U.S. at 255)).

## III. ANALYSIS

Title VII's anti-retaliation provision makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made [unlawful by Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). A plaintiff may establish retaliation "either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010) (quoting *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008)).

Fierst has offered no direct evidence of retaliation.  Rather, he advances a circumstantial case for retaliation, which the Court must examine under the *McDonnell Douglas* evidentiary framework used to assess claims of discrimination.  *Imwalle*, 515 F.3d at 544.  At the *prima facie* stage, Fierst must show that: (1) he engaged in a protected activity under Title VII; (2) the OAG knew it; (3) the OAG thereafter took an adverse employment action against him; and (4) there was a causal connection between the adverse employment action and Fierst's protected activity. *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 995–96 (6th Cir. 2009).  If Fierst establishes his *prima facie* case, the burden of production shifts to the OAG to articulate a legitimate nondiscriminatory reason for its adverse employment action.  *Id.* at 996.  Once it does, Fierst then must show that the OAG's reason is a pretext for retaliation.  *Id.*  He can do so by proving that the reason: (1) had no basis in fact; (2) did not actually motivate the OAG; or (3) was not sufficient to warrant termination.  *McCowen v. Village of Lincoln Heights*, 624 F. App'x 380, 383 (6th Cir. 2015) (citing *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 597 (6th Cir. 2007)).

Here, the first three elements of Fierst's *prima facie* case clearly are satisfied.  The OAG contends, however, that Fierst cannot show "but-for" causation regarding his termination, the required fourth element, or that its reasons underpinning his termination were pretextual.  (Doc. 43 at PageID 2715).

A plaintiff making a Title VII retaliation claim must establish that his protected activity was "a but-for cause of the alleged adverse action by the employer."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).  In this civil action, it means that Fierst must present evidence from which a reasonable jury could find that the OAG would not have fired him if he had not filed either his EEOC charge or his internal discrimination complaint.  *See EEOC v.*

*Ford Motor Co.*, 782 F.3d 753, 770 (6th Cir. 2015) (*en banc*). Fierst need not prove, however, that retaliation was the OAG's *only* motive, because adverse employment actions can have more than one "but-for" cause. *McCowen*, 624 F. App'x at 384 (citing *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315–16, 321 (6th Cir. 2012)).

In *Ford Motor Co.*, the Sixth Circuit affirmed the district court's grant of summary judgment to the employer on a claim of retaliation. 782 F.3d at 758, 770. It concluded that the EEOC could not establish but-for causation—and thus meet its *prima facie* case—and that, alternatively, even if it had, it could not establish pretext. *Id.* at 767–70. Both Fierst and the OAG believe that *Ford Motor Co.* supports their respective positions. Fierst presents the better argument, but barely.[10]

The Court has read the entire deposition transcripts of Carroll, Fixler, Wagner, and Barnes, as well as Fulkerson, Cadek, Madden, Murniecks, and Mertz. It is an understatement to concede, as the OAG has, that its "senior administration members recall the details of the termination decision *somewhat* differently." (Doc. 43 at PageID 2721 (emphasis added).)

First Assistant Mertz, the "official" decision-maker, remembers very little. She talked to Madden, Barnes, and Wagner, and from those conversations she learned that Fierst "did not want to fill out his Performance Evaluation" (Mertz Dep., Doc. 19 at PageID 408 (15:8–13)), "did not want to take direction on editing documents" (*id.* at PageID 405 (12:10–17)), and "was a negative influence in the [Cincinnati] office" (*id.* at PageID 406 (13:15–23)). She recalls that, based on these factors, "and overall, for someone in a highly paid position[,]" Human Resources Director Madden recommended termination. (*Id.* at PageID 412–13 (19:23–20:13).) As to *when*

---

[10] The OAG correctly notes that Fierst "has somewhat collapsed the analysis of pretext and his *prima facie* case obligation to show a but-for causal connection between his discrimination complaint and his termination." (Doc. 43 at PageID 2716.) This is understandable, inasmuch as the Sixth Circuit appears to have done so in both *McCowen*, 624 F.3d at 383 and *Ford Motor Co.*, 782 F.3d at 770.

Madden made her recommendation, Mertz cannot recall.  (*Id.* at PageID 418 (25:5–11).)  Finally, she has no memory of anyone telling her that Fierst "was refusing to work on a particular HHS matter[.]"  (*Id.* at PageID 425 (32:6–14).)

Chief Operating Officer Murnieks testified that she discussed the decision to "revoke Mr. Fierst's unclassified appointment" with Mertz, her superior:

> I recall there being a discussion that there were continuing issues with Mr. Fierst, and that **it was the desire of the Workers' Comp section leadership to terminate his employment, and I informed her of that**.

(Murniecks Dep., Doc 20 at PageID 469–70 (33:17–34:2) (emphasis added).)  Murniecks characterized Mertz's response as one of "not object[ing]" to the decision.  (*Id.* at PageID 471 (35:8–23).)  She could not recollect whether she spoke to Section Chief Barnes and Managing Attorney Wagner about whether they were in agreement with terminating Fierst, but testified affirmatively with respect to Madden and Deputy Chief Counsel Fulkerson, both of whom were.  (*Id.* at PageID 475–77 (39:24–41:1).)  Yet Fulkerson denies recommending termination of Fierst to *anyone*.  (Fulkerson Dep., Doc. 23 at PageID 981(24:17–20).)  Confirming that he knew about the termination in advance of it happening, Fulkerson testified:

> I recall being in a meeting in the Columbus office.  I recall a -- I don't remember what the subject of the meeting was, but at some point the meeting was breaking up and someone asked a question about the Cincinnati office.  **And I recall Kathleen Madden asking can we get rid of David Fierst.  And I recall Mary Mertz saying yes.**

(*Id.* at PageID 989–90 (32:15–33:3) (emphasis added).)

Section Chief Barnes likewise denies recommending termination of Fierst.  He became "aware" that the decision had been made in a telephone call from Madden, who was asking when Fierst would be in the office.  (Barnes Dep., Doc. 17 at PageID 82–83 (23:21–24:19).)  During that conversation, Madden did not tell Barnes who had made the decision to terminate.  (*Id.* at

PageID 83 (24:20–23).)  When asked, at any time prior to the call from Madden, had *he* recommended to her, or anyone else, that Fierst be terminated, Barnes testified:

> A    I don't believe I made a specific recommendation, but there were discussions regarding – there were discussions regarding his performance and my concern with his performance.

> Q    In the course of any of those discussions did you tell whoever you were talking to that you, James Barnes, were recommending that Fierst be terminated?
>
> MS. ITA:  Objection.
> Go ahead.
>
> THE WITNESS:  I don't recall that I had that discussion – those discussions.

(*Id.* at PageID 84 (25:8–24).)

Human Resource Director Madden did not equivocate during her deposition testimony. She first heard of Fierst "in approximately June of 2014 through July of 2014, and the context was related to his refusal to complete a self-evaluation as part of the annual performance evaluation process."  (Madden Dep., Doc. 18 at PageID 240 (15:8–15).)  She believed that Fierst filed his charge with the EEOC because he was "upset with the ultimate result of th[at] evaluation."  (*Id.* at PageID 258–59 (33:19–34:5).)  And she considered Fierst's charge to be "frivolous," (*id.* at PageID 260 (35:20–22)), an opinion she shared with Mertz, (*id.* at PageID 262 (37:5–22)).

Drawing all justifiable inferences in Fierst's favor, the Court believes there is sufficient evidence from which a reasonable jury could conclude that that filing of his EEOC charge and his internal discrimination complaint was *a* "but-for" cause of his termination.  Thus, Fierst has established a *prima facie* case of retaliation.  Fierst became a known quantity to Madden during his evaluation process, which concluded with Fierst's July 16, 2014 response that was not well

received by Managing Attorney Wagner.  (Wagner Dep., Doc. 36 at PageID 2560–66.)  Actually, Wagner was so irritated by it that he contacted Section Chief Barnes to offer his support should Barnes want to "reach out to the administration and HR[.]"  (*Id.* at PageID 2565 (28:6).)  Wagner deposed:

> I told James – James wasn't even soliciting my advice.  I told James that Dave Fierst strikes me as an employee that does not want to be here, does not want to work for this organization, but hasn't left on his own accord.  And I couldn't even tell him what it is that he should do, but I encouraged him to reach out to the administration and HR and that I would assist in any manner.

(*Id.* at PageID 2564–2565 (27:25–28:8).)  But reaching out became unnecessary, because "[t]he filing of the EEOC complaint [the next day, July 17, 2014] brought Dave to the attention of the administration.  It just brought it to a head."  (*Id.* at PageID 2567 (30:4–7).)  Following the EEOC charge was Fierst's internal discrimination complaint filed on July 24, 2014.  Completion of that process, including Fierst's exercise of his right to appeal EEO Compliance Officer Cadek's finding, did not occur until March 18, 2015, just four months before Fierst was terminated.  This proximity in time favors Fierst.  *Ford Motor Co.*, 782 F.3d at 767 (citing *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012)).  Yet the Court cannot—and does not—rely on timing alone.

While there is no dispute that Fierst was highly paid[11] and that the Workers' Compensation section was underfunded, Madden acknowledges that no other person was terminated to bridge the budget shortfall.  (Madden Dep., Doc. 18 at PageID 304–05 (79:18–80:10).)  And contrary to Chief Operating Officer (and Madden superior) Murnieck's testimony that the Workers' Compensation section "leadership" wished to terminate Fierst's employment,

---

[11] There were 43 attorneys in the Workers' Compensation section as of the date Fierst was terminated.  (Doc. 27-4 at PageID 1324**.**)  He was paid more than 34 of them, and less than just 8 of them.  Admitted to the bar in 1990, Fierst's hourly rate was $44.94.  (*Id.*)  Carroll, Fierst's team leader in the Cincinnati Workers' Compensation unit and admitted in 1976, earned the next highest hourly wage, $45.05.  (*Id.*)  Fixler, head of that unit and admitted in 1981, earned $48.45.  (*Id.*)  Finally, Section Chief Barnes, admitted in 1985 earned $53.51 per hour.  (*Id.*)

Fulkerson and Barnes deny any such recommendation. So does Wagner. From all this evidence a reasonable jury could conclude that the *only* person who recommended termination was Human Resources Manager Madden, who had been tasked with the responsibility of conducting an internal investigation and submitting a position statement to the EEOC defending the OAG. Against a charge she described as "frivolous."

This same evidence protects Fierst from an adverse summary judgment on the issue of pretext. In response to an interrogatory asking Defendant to "[s]tate each reason for the decision to terminate Plaintiff's employment[,]" Madden answered: "Plaintiff [Fierst] was terminated because, in the face of budget constraints, the OAG made the decision to terminate an employee who was difficult to manage, created an unprofessional environment, was insubordinate to his manager, and was paid more than the vast majority of other assistant attorneys general." (Doc. 18-1 at PageID 372.) On the record before the Court, a reasonable jury could not conclude that these reasons had no basis in fact or—especially in light of Fierst's unclassified appointment— that they were not sufficient to warrant termination. But there *is* adequate evidence to allow a reasonable jury to conclude that these legitimate non-discriminatory reasons did not actually motivate Fierst's termination. *McCowen*, 624 F. App'x at 383–84. The surprisingly vague testimony of Mertz, the purported decision-maker, suggests that she was nothing more than a rubber stamp. The testimony of Murnieck is wholly undermined by the testimony of "leadership" attorneys Fulkerson and Barnes. And the testimony of Madden, while self-assured, plainly allows for the reasonable inference that she *alone* recommended Fierst's termination in the wake of his "frivolous" charge of discrimination.

The Court would be remiss if it did not recognize that there is ample evidence from which a reasonable jury also could conclude that Fierst was a malcontent whose termination

would have inevitably happened.  An overpaid lawyer in terms of workers' compensation experience, in a department operating under a deficit, he was boorish to coworkers and bordered on insubordinate with management.  As such, a reasonable jury could determine that Fierst was a logical candidate for separation.  Indeed, as early as January 2014, in the aftermath of the teleconference held with respect to the Carr appellate brief, Fierst himself testified that he was "pretty shaken" afterward because he thought his employment "was in jeopardy."  (Fierst Dep., Doc. 21 at PageID 632–33 (133:17–134:2).)  And although Fierst exalts his overall "category" ratings in his performance reviews, he ignores the substantive comments, largely unfavorable, incorporated by his raters and reviewers.

How this matter resolves will depend heavily on credibility assessments that, of course, must be made by a jury during trial rather than by this Court on summary judgment.  And while the Court is doubtful that a jury will be convinced of Fierst's version of the facts, under the case law he is entitled to try.

## IV.  CONCLUSION

For all the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 27), on the remaining issue of retaliation, is hereby **DENIED**.

**IT IS SO ORDERED**.


Dated: May 4, 2017                     S/Susan J. Dlott_____
                                       Judge Susan J. Dlott
                                       United States District Court